TRANSPORT WORKERS' UNION OF
PHILADELPHIA, LOCAL 234

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY.

TRANSPORT WORKERS' UNION OF
AMERICA LOCAL 2013

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY.

BROTHERHOOD OF LOCOMOTIVE
ENGINEERS, DIVISION 71, et al.

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION
AUTHORITY, et al.

UNITED TRANSPORTATION
UNION, et al.

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY.

Civ. A. Nos. 87–0389, 87–0446,
87–0448 and 87–0455.

United States District Court,
E.D. Pennsylvania.

Jan. 19, 1988.

**544**

Michael Brodie, Philadelphia, Pa., for Transport Workers' Union of Philadelphia, Local 234.

Jonathan K. Walters, Kirschner, Walters & Willig, Philadelphia, Pa., for Transport Workers' Union of America Local 2013.

Clinton J. Miller, III, United Transp. Union, Harold A. Ross, Ross & Kraushaar, Co., L.P.A., Cleveland, Ohio, and Cornelius C. O'Brien, III, O'Brien & Davis, Philadelphia, Pa., for United Transp. Union.

Mitchell Kraus, Broth. of Ry., Airline, and Steamship Clerks, Rockville, Md., for Broth. of Ry., Airline, and Steamship Clerks.

John F. Smith, III, Richard S. Meyer, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for Southeastern Pennsylvania Transp. Authority.

MEMORANDUM

LUDWIG, District Judge.

In these consolidated actions, upon the application of plaintiffs [1] and upon hearing, defendant Southeastern Pennsylvania Transportation Authority (SEPTA) was preliminarily enjoined, on February 9, 1987, from implementing a random drug testing program of its employees under SEPTA Order No. 87–1. Fed.R.Civ.P. 65(a). Thereafter, SEPTA modified its proposed program and moved to vacate the injunction. Additional evidentiary hearings oc-curred during which SEPTA made further changes in the program. The parties agreed to an adjudication for permanent injunctive relief. Fed.R.Civ.P. 65(a)(2).

The following decision is entered, and an accompanying order will be filed:

1. The preliminary injunction is now dissolved.

2. Plaintiffs' request to enjoin random testing as unconstitutional is denied, and subject to certain conditions, random testing will be permitted.

3. So-called "return to work" testing, as proposed, will be enjoined as constitutionally unjustified.

4. As to the Railroad Brotherhood plaintiffs,[2] random testing will be enjoined because the proposal invoked a "major dispute" under Section 6 of the Railway Labor Act, 45 U.S.C.A. § 151 *et seq.* (West 1986), and, consequently, notice, collective bargaining, and mediation are prerequisite.

I.

Transport Workers' Union of Philadelphia, Local 234 (TWU), together with its affiliated International Union, represents 5,700 of SEPTA's 6,500 employees. The balance are members of the five other plaintiff unions, under Section 151 of the Railway Labor Act, 45 U.S.C.A. § 151, Sixth. United Transportation Union, Local 1594, also represents bus and trolley operators of SEPTA's Red Arrow division under Pennsylvania's Public Employe Relations Act, 43 P.S. § 1101 *et seq.* (Purdon Supp. 1987). SEPTA is an agency and instrumentality of the Commonwealth of Pennsylvania, under a certificate of incorporation dated February 7, 1964, and is organized under the Metropolitan Transportation Act of 1965, 66 P.S. § 2001, *et seq.* (repealed) and the Pennsylvania Urban Mass Transportation Law, *as amended,* 55 P.S. § 600.101 *et seq.* (Purdon Supp.1987).[3]

---

1. Plaintiffs are six unions and the chairman of a local chapter of the Brotherhood of Locomotive Engineers. Fact Stip. ¶ 1–8.

2. These are the United Transportation Union, Brotherhood of Locomotive Engineers, Brotherhood of Railway, Airline and Steamship Clerks, Brotherhood of Maintenance of Way Employees, and Brotherhood of Railroad Signalmen.

3. The members of SEPTA's board of directors are named as individual defendants and in their official capacities.

By Act of Assembly, SEPTA is empowered to own and operate transportation facilities in the Philadelphia five-county metropolitan area. Its present operations include the City Transit Division; the Suburban Transit Division (Red Arrow–Delaware County); the Frontier Division (Montgomery County); and the Regional Railroad Division, which provides commuter rail service between the city and suburban counties. The City Transit Division operates the Broad Street and Market Street subways, the Frankford Elevated, and many bus, streetcar and trackless trolley routes in Philadelphia. SEPTA also maintains numerous stations, depots, platforms, tracks, shops and other installations. Employment terms and conditions are set forth in collective bargaining agreements with plaintiff unions.

SEPTA's operational area covers about 2,200 square miles. The City Transit Division accommodates some 798,000 passenger trips daily; the Suburban Transit Division, 66,000; the Regional Rail Division, 78,000. In 1986, more than 350 million passenger rides occurred on SEPTA vehicles. On an average weekday in 1986, the number exceeded 1.2 million. City buses and trolleys reach speeds up to 50 miles per hour; trains as high as 95 miles per hour; other high speed vehicles, 60 miles per hour. Vehicle operators must be attentive to their work. Subway and train signal systems are complex and demanding. Braking requires vigilance and sound judgment. Some special risk factors that can affect train operation are grade crossings and trespassers on rights of way. Bad weather, unruly passengers, and crowded vehicles are problems generally. A vehicle operator must have a clear mind and the ability to react quickly and efficiently.

New operators must be trained. Support staff inspect and maintain essential equipment. SEPTA police carry firearms.

The unions agree that consumption of alcohol or controlled substances can render an employee unfit for work. The need to protect the safety of passengers, pedestrians, motorists, and other employees is undisputed. For over 30 years, the collective bargaining agreements between SEPTA and TWU have provided that an employee who reports to work or who becomes under the influence of intoxicating liquor or drugs will be discharged.

On September 20, 1985 SEPTA promulgated Order No. 85–1, which called for urine or blood testing of employees suspected of being in "possession of intoxicants or controlled substances," and which described such possession as "a dischargeable offense." [4] It also issued Order No. 85–2, which permitted "a troubled employee [one with an alcohol or drug problem] to maintain an employment relationship and have ... [a] reasonable leave of absence to obtain treatment."

In 1986, in at least three accidents, SEPTA passenger vehicle operators appeared to have been impaired by drugs or alcohol. In a train collision December 10, 1987, an engineer and a conductor were tested positive for cocaine. Tests of two conductors also were positive for marijuana. Forty-two people were injured. In a fourth accident in 1986, the operator refused testing. In 1987, three accidents also appear to have been cocaine or marijuana related as shown by post-accident testing. Between January, 1985 and July, 1987, a total of 14 percent, or nearly one seventh, of the drug and alcohol tests taken pursuant to 85–1 were positive. The problem of substance abuse is societal. It is inescapable that the

4. Rule 1 in effect in the Regional Railroad Division from January 1, 1983 to October 27, 1985 stated in part:

The use of intoxicants, narcotics, amphetamines or hallucinogens by employees subject to duty or their possession or use while on duty is prohibited. Employees suspected of being under the influence in violation of this rule may be required to take a blood and/or a urinalysis test. Employees who refuse to take these tests or who are found to be under the

influence as a result of tests will be subject to disciplinary procedures which may result in dismissal from the Authority's service.

Thereafter, on October 27, 1985, SEPTA issued RRD Special Instruction 100I–A2 which provided that members of the railroad unions "may be required to provide a urine sample after certain accidents and incidents or at the time the company reasonably suspects [an employee is] under the influence of, or impaired by drugs while on duty."

undue use of drugs or alcohol by the operator of a motor vehicle can be hazardous and potentially injurious, if not life-threatening. Where mass transit is concerned, the risk can involve large numbers of people.

SEPTA's decision to embark on unscheduled—"surprise"—testing of its employees arose from management's belief that cause or suspicion testing was ineffective to reduce on-the-job impairment. Patterned on other programs, SEPTA Order No. 87-1, issued January 21, 1987, was designed to interrelate educational prevention; treatment and rehabilitation; and monitoring and deterrence. The third element is embodied in unscheduled random testing.[5] Order No. 87-2, promulgated February 3, 1987, provided that an employee returning to work after a 30–day absence was subject to body fluid testing for drugs or alcohol.

In opposition to the testing, plaintiffs filed these actions and immediately sought injunctive relief, asserting that 87-1 violates the Fourth Amendment prohibition against unreasonable searches and seizures. They also contend that testing of employees returning to work after a 30–day hiatus under 87-2 is not constitutionally justifiable and that the entire program, as proposed, abridges the employee's confidentiality rights, and is overly broad, punitive, and inappropriate.[6] The Rail Brotherhoods maintain that the issues raised by 87-1 and 87-2 constitute a "major dispute" under the Railway Labor Act. If so, the Act requires notice and exhaustion of negotiation and mediation procedures before a change in the labor contract can be effectuated. 45 U.S.C.A. § 156. SEPTA has not given notice. Its view is that 87-1 and 87-2 are evolutionary outgrowths of 85-1 and are not a radical alteration of past policies. The United Transportation Union, Local 1594, also claims that it is entitled to protective procedures under Section 1101.-701 of the Pennsylvania Public Employe Relations Act.

SEPTA was preliminarily enjoined from proceeding with 87-1 and 87-2 because the program, as evidenced, was excessively intrusive and did not carry out its objectives. A Fourth Amendment violation appeared, therefore, to be likely. Also, under the Railway Labor Act, an ultimate finding of a "major dispute" was predictable. Bench opinion, February 9, 1987.

## II.

On July 27, 1987 after months of consultation with experts and union representatives, SEPTA proposed a revised program and filed a petition to vacate the preliminary injunction.[7] Extensive testimony was given by toxicologists, pharmacologists, physicians, psychologists and others in defense and in criticism of the proposal. Areas of debate were the accuracy of the testing procedures, the positive thresholds, the incidence of testing, including the categories of employees subject to testing, the inclusion of prescription medication, the definition of fitness for duty, the type and the function of the employee assistance program, the effect of passive inhalation, the role of SEPTA's medical department, and SEPTA's administration of 85-1 and 85-2 during the past two years.[8]

As set forth in the revised proposal, the purpose of the program is to enforce a fitness for duty standard. This standard is applied to a class known as "operating employees" and is defined as the absence from one's system of alcohol, drugs and drug metabolites above specified thresholds. About 4,400 SEPTA employees come

---

5. On January 23, 1987 urine tests of 13 randomly selected employees proved negative. This was the only day on which 87-1 was implemented. Thereafter, SEPTA agreed to await the outcome of these actions.

6. Plaintiffs filed amended complaints challenging 87-2.

7. Thereafter, SEPTA continued to make revisions in response to concerns expressed by the unions and by the court.

8. With the parties consent, a court-appointed independent expert—a psychiatrist with expertise in pharmacology—was retained. This expert reviewed the testing proposal and the testimony of the parties' experts and consulted with the parties and the court.

within this classification.[9] Breath testing is to be used for alcohol detection and is to be administered under forensically acceptable conditions. A positive result requires two successive minimum levels of .04 percent. For drugs, the testing modality is urinalysis. The specimen is to be given inside a private, partitioned bathroom stall. There are detailed specifications to assure chain of custody, proper laboratory control, and scientific testing. After initial screening, a positive result is subject to a confirmation procedure by gas chromatography/mass spectrometry, which is considered to be the most accurate technology available. *See Williams v. Secretary of Navy,* 787 F.2d 552, 555 (Fed.Cir.1986).

In the educational, or preventative phase, of the program, SEPTA employees will be informed about the harmful effects of drug and alcohol abuse, the availability of treatment, and SEPTA's employee and enforcement policies. In July, 1987 SEPTA sent its employees the revised program. Regular mailings and educational presentations will be made. Random testing will not be begun until 90 days after the program goes into effect and no earlier than 30 days after the proposed employee assistance program is operational.

The employee assistance program will utilize an outside provider as opposed to in-house services. Its purpose is to offer substance abuse treatment and rehabilitation. If the employee voluntarily self-refers having not had a positive test result, he can obtain a second period of treatment. While in treatment, employees are to receive unused sick pay. A post-treatment 90–day period of alternative job assignment will occur, and the employee will be subject to unannounced testing.[10] Upon two positive tests, the employee is dischargeable. An employee who tests positive on a random screening or on return to work has one opportunity for self-referral and must not test positive again. Such employee is also subject to unannounced follow up testing for 12 months and scheduled testing for two years thereafter. If treatment is refused, the employee will be discharged. Employment assistance information will be given to SEPTA's medical department, which is to maintain it as confidential. No disclosure will be made to law enforcement authorities, and availability within the medical department is to be limited to "need-to-know."

Return to work testing applies to "operating employees" who return to work after a 30–day absence. The reason for the absence is immaterial.[11]

The selection of employees to be randomly tested will be made pursuant to a protocol developed by a statistician and will be computerized. 2,600 of the 4,400 operating employees will be tested for drugs and alcohol each year—33 percent once, 10 percent twice, and two percent more frequently. About 5,400 random breath alcohol tests will also be given. Using this statistical design, each operating employee will be at testing risk every day, although the chances of being tested more than twice a year will be small. The total cost of the program for the first two years will be $3 million and should diminish thereafter.

9. The following positions are specifically enumerated:

    1. Engineer, Bus Person, Surface Train Person, Subway–Elevated Trainperson
    2. Conductors and Passenger Attendants
    3. Construction Equipment Operators
    4. Superintendents of Operations, Towerpersons, Train Dispatchers, and Power Dispatchers
    5. Signal Maintainers
    6. Power Distribution Maintainers
    7. Vehicle, Mechanical, Track and Structural Inspectors
    8. Welders
    9. Sworn SEPTA police officers
    10. Any employee authorized to carry a firearm on duty

11. Instructors and supervisors of the foregoing.

10. The pay scale will be for the alternative assignment.

11. Testing of "operating employees" who are transferred within SEPTA was also mentioned at the hearings. In October, 1987, TWU filed a second amended complaint claiming damages for employees tested under the return to work provisions of 87–2 and challenging other body fluid testing that occurs without reasonable suspicion. It is agreed that the only issues to be adjudicated here concern random and return to work testing under 87–1 and 87–2.

Operating employees taking prescription medication will be required to obtain approval from SEPTA's medical department before reporting to work. A fitness for duty determination will be made in consultation with the prescribing physician and a medical consultant. The prescription will be confidential information.

As finally revised, the program contemplates establishment of an advisory committee of labor representatives to review the program semi-annually and to consult with SEPTA management as to any important changes—such as enlargement of the class of operating employees, a change in the employee assistance provider or testing analysis laboratory.

The basic design of the program was formulated by a psychologist who is the director of Rutgers University Center of Alcohol Studies. He testified that he successfully developed similar programs for the United States Navy and professional sports. In his opinion, an effective program requires a balanced combination of education, treatment, deterrence and enforcement. The testing is aimed at detecting chronic abusers, not actual impairment. The reason is two-fold: On the one hand, actual impairment is hard to measure using present technology. On the other, if testing were pre-scheduled and announced in advance, many abusers would be able to stay drug-free during the testing period. A positive result establishes relatively recent intake in a pharmacologically active amount. Tr. Sept. 9, 1987, at 21. In his opinion, the testing must be at random, unannounced, and done daily in order to act as an effective deterrent.

Although problems remain [12] with the revised program, it is not so intrusive or unreasonable as to fail to withstand constitutional scrutiny. Given the experience in other settings, the program appears to be logically related to its purposes. After a suitable trial period, improvements can be made and deficiencies can be corrected. Plaintiffs are not foreclosed from instituting a specific challenge at a later date. *See American Federation of Government Employees, AFL–CIO v. Dole,* 670 F.Supp. 445, 449 (D.D.C.1987). By repeated revision of the original program, SEPTA has shown some willingness to accept recommendations and to accommodate other points of view.

With much force, the unions argue that the program is largely experimental; that a less intrusive program could be tried first; that the proposal is a substantial departure in policy that is unlikely to be accepted by SEPTA's already discontented employees; that the program would be much more effective if SEPTA were willing to share control of it with labor; and that rigid administration, as has occurred in the past, will produce arbitrary and unjust results. Making due allowance for that position, the reasons for permitting random testing to proceed are the evidence of a drug problem among SEPTA's employees and the now well recognized presence of substance abuse in our society; the public interest in having a mass transportation system operated as safely and efficiently as practicable; the knowledge of operating employees of the safety critical nature of their jobs; the employees' corresponding diminished expectation of privacy in the performance of their duties; the probable efficacy of the program; the various measures to minimize the intrusiveness of the searches; and SEPTA's testimonial pledge to implement the program fairly and sensitively.

### III.

■ Because it is a state agency and instrumentality, the Fourth Amendment applies to SEPTA, through the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Com-

---

12. See Bench Remarks, September 25, 1987. Since then a number of criticisms were rectified, but, in my view, a much better program could have been proposed if SEPTA had abandoned its traditional approach to labor-management issues. The constitutionality of substance testing by a public employer must rest on the public's needs, not the employer's. The best chance of success with such a program is to have the cooperation of labor, which requires that management share—just as a matter of enlightened self-interest—some of its decision-making and administrative powers. This SEPTA has agreed to do only in small measure.

pulsory urinalysis and chemical breath testing have been held to be searches and seizures within the meaning of the Fourth Amendment. *E.g., National Federation of Federal Employees v. Weinberger*, 818 F.2d 935, 942 (D.C.Cir.1987) (citing cases). To comply constitutionally, searches must be reasonable. *New Jersey v. TLO*, 469 U.S. 325, 337, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985). Although a warrant and probable cause or some quantum of individualized suspicion bear on the reasonableness issue, the Fourth Amendment does not require an irreducible minimum of individualization. *United States v. Martinez–Fuerte*, 428 U.S. 543, 560–61, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). Sometimes, the balancing of interests attenuates an individualized approach. *E.g., National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 176–77 (5th Cir.1987).

The evidence demonstrates that SEPTA's suspicion-testing program has not been enough to satisfy the needs of public safety and mass transit reliability. In turn, employees in operational positions cannot reasonably expect SEPTA to ignore its responsibility to do all possible to ensure public confidence in its services. *Von Raab*, 816 F.2d at 180; *Shoemaker v. Handel*, 795 F.2d 1136, 1142 (3d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986). In these circumstances, the constitutionality of the program depends on a "balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). *McDonell v. Hunter*, 809 F.2d 1302, 1305 (8th Cir.1987). *See O'Connor v. Ortega*, —— U.S. ——, 107 S.Ct. 1492, 1501–03, 94 L.Ed.2d 714 (1987) (plurality opinion) (public employers have overriding administrative interest different from law enforcement so that intrusions on privacy of government employees in investigating work related misconduct should be assessed by reasonableness standard and totality of circumstances).

SEPTA's interests in the safety of its passengers and in the public's reposing confidence in its system are of paramount importance. *Division 241, Amalgamated Transit Union v. Suscy*, 538 F.2d 1264, 1267 (7th Cir.) *cert. denied*, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976). "Government has a vital interest in making certain that its employees, particularly those whose impairment endangers their co-workers or the public, are free of drugs." *Capua v. City of Plainfield*, 643 F.Supp. 1507, 1511 (D.N.J.1986). It is perhaps stronger than New Jersey's interest in "assuring the public of the integrity of the persons engaged in the horse racing industry." *Shoemaker*, 795 F.2d at 1142 (that interest and jockeys' reduced expectation of privacy held to justify program of random breath testing and urinalysis). As with all public employers, SEPTA is required by law to administer its work properly and efficiently. *O'Connor*, —— U.S. at ——, 107 S.Ct. at 1501–03.

The well known effects of alcohol and drug abuse, together with the two-year record of positive test results and accidents and injuries since 85–1, sufficiently show that public safety and public confidence problems exist in SEPTA's operations. Although the percentage of employees who chronically abuse alcohol and drugs may not be large, SEPTA is obligated, legally, ethically and as a matter of good management, to take steps to reduce the problem to a minimum. *Jones v. McKenzie*, 833 F.2d 335, 340 (D.C.Cir.1987). Needless serious personal injuries and deaths caused by alcohol or drug related accidents are the unacceptable alternative. SEPTA must continually explore a variety of programs with its employees and its equipment to improve the safety of its operations. Moreover, SEPTA should be encouraged to take remedial measures and to design new personnel programs if reasonable and minimally intrusive. *See Von Raab*, 816 F.2d at 179 (not unreasonable to address a potential drug problem even in the absence of evidence of prior drug related accidents or individualized suspicion that a particular employee has a drug or alcohol problem). All of SEPTA's operating employees must be acutely aware that the public questions

the system's safety and reliability, including the presence of alcohol and drug abuse.

Reliance on suspicion testing appears, therefore, to be inadequate. Many drugs have delayed, residual or chronic effects not ascertainable through behavioral observation. Tr. Feb. 5, 1987, at 311–316. Numerous SEPTA employees operate without close supervision. Even obvious impairment can go undetected. Recurrent notice testing will detect only those who cannot temporarily abstain. Considering our present knowledge and experience, a program of frequent random testing may be the best means of assuring that SEPTA employees will not be impaired and of gaining public acceptance and support. *Shoemaker*, 795 F.2d at 1142. It may be the only way to deal with the problem of substance abuse in a highly regulated and safety critical industry affected with the public interest. *McDonell*, 809 F.2d at 1308.

Drug screening by urinalysis is, concededly, a serious infringement of an individual's reasonable expectation of privacy.[13] As revised, the SEPTA program markedly reduces its intrusiveness. Union consultation is contemplated. Alcohol testing, conducted by breathalyzer, is less intrusive than urinalysis or blood testing. Urinalysis, properly administered, is not as intrusive as a strip search or a blood test. *McDonell*, 809 F.2d at 1308; *Von Raab*,

816 F.2d at 177. Advance notice reduces the intrusive nature of a search. *Weinberger*, 818 F.2d at 943; *Shoemaker*, 795 F.2d at 1142; *Capua*, 643 F.Supp. at 1515 (surprise early morning urinalysis of city fire fighters unconstitutional).[14]

As noted, collection personnel do not observe the employee during urination, which takes place in a private restroom stall. *See Mullholland v. Department of Army*, 660 F.Supp. 1565, 1569 & 1576 (E.D.Va.1987). A high degree of confidentiality is to be maintained. "The need for protection against governmental intrusion diminishes if the investigation is neither designed nor likely to be used to bring criminal charges against the person investigated." *Von Raab*, 816 F.2d at 179. *See O'Connor*, —— U.S. at ——, 107 S.Ct. at 1501; *Shoemaker*, 795 F.2d at 1140 (test results kept confidential from enforcement agencies). There are provisions allowing an employee whose test is positive to challenge the result. *See Banks v. Federal Aviation Admin.*, 687 F.2d 92, 95 (5th Cir.1982). The detailed chain of custody provisions virtually eliminate the possibility that a sample will be incorrectly identified. *Rushton v. Nebraska Public Power Dist.*, 653 F.Supp. 1510, 1526 (D.Neb.1987).

The program contains a strong rehabilitative component, and an ameliorative distinction is made between a voluntary self-

**13.** "One does not reasonably expect to discharge urine under circumstances making it available to others to collect and analyze in order to discover the personal physiological secrets in holds." *McDonell v. Hunter*, 612 F.Supp. 1122, 1127 (S.D.Iowa 1985), *aff'd as modified*, 809 F.2d 1302 (8th Cir.1987). Urine testing may disclose whether the employee is under treatment for an illness and the presence of nonprescription substances such as blood. "There are few activities in our society more personal or private than the passing of urine." *Von Raab*, 816 F.2d at 175.

**14.** A growing number of decisions have concluded that nonsuspicion mandatory urinalysis by a public employer is unconstitutional. *See, e.g., Policemen's Benevolent Assoc., Local 318 v. Township of Washington*, 672 F.Supp. 779 (D.N.J.1987) (police officers); *Taylor v. O'Grady*, 669 F.Supp. 1422 (N.D.Ill.1987) (correctional employees); *Feliciano v. City of Cleveland*, 661 F.Supp. 578 (N.D.Ohio 1987) (police academy

candidates); *American Federation of Government Employees v. Weinberger*, 651 F.Supp. 726 (S.D.Ga.1986) (civilian police employed by Department of Defense); *Lovvorn v. City of Chattanooga*, 647 F.Supp. 875 (E.D.Tenn.1986) (fire-fighters); *Caruso v. Ward*, 133 Misc.2d 544, 506 N.Y.S.2d 789 (Sup.Ct.1986), *aff'd*, 131 A.D.2d 214, 520 N.Y.S.2d 551 (App.Div.1987) (members of organized crime control bureau); *Patchogue-Medford Congress of Teachers v. Board of Education*, 119 A.D.2d 35, 505 N.Y.S.2d 888 (App.Div.1986), *aff'd*, 70 N.Y.2d 57, 510 N.E.2d 325, 517 N.Y.S.2d 456 (1987) (public school teachers). Many of these cases distinguish *Shoemaker* and other nonsuspicion testing decisions based on insufficient showing of need, or of reduced expectations of privacy, or because of a high degree of intrusiveness. None involves a work environment as demonstrably safety sensitive as SEPTA's, compelling evidence of a current drug and alcohol problem unlikely to be solved by less aggressive measures, and a program as carefully drawn as SEPTA's.

referral and an employee whose unfitness is raised by a test result. Though the incidence of testing may be unduly large, the protocol was intended to maximize its deterrent value, an essential part of the integrated program. Tr. Feb. 5, 1987, at 284. *Von Raab,* 816 F.2d at 180. With time, its volume can be reduced. Moreover, the plan approved by this Circuit, in *Shoemaker,* authorized the testing of the same jockey three times in one week. *Shoemaker,* 795 F.2d at 1140. Here, by comparison, only two percent of the operating employees will be tested more than twice a year.

The random screening protocol assures that selection for testing is at random and eliminates any exercise of discretion by SEPTA management. Specific and definite standards for determining a positive test result are set forth, and the testing is to be conducted by an accredited independent laboratory. Specific procedures for sample collection are included in the program. These safeguards are sufficient to protect the employees' reasonable expectations of privacy from the exercise of discretion by SEPTA management in deciding of whom, when and in what manner to conduct the search. *Delaware v. Prouse,* 440 U.S. 648, 655 & 663, 99 S.Ct. 1391, 1396–97 & 1401, 59 L.Ed.2d 660 (1979); *Von Raab,* 816 F.2d at 177; *Shoemaker,* 795 F.2d at 1143.

■ However, the considerations that justify random testing in an integrated program do not pertain to return to work testing. That aspect of SEPTA's proposal is unwarranted constitutionally absent some reasonable suspicion or programmatic basis. With random testing in place, the need for return to work testing would substantially be eliminated. Employees who return to work will immediately be subject to daily random testing. The physical examination conducted upon return to work should be sufficient to identify employees clearly not fit for duty. SEPTA has not met its burden of justifying return to work as an occasion for testing. *Weinberger,*

818 F.2d at 943 (citing *TLO,* 469 U.S. at 341–42, 105 S.Ct. at 743–44.) The indiscriminate scope of this policy includes those who have been ill, on leave of absence—or any employee who has not been at work for 30 days. There was no evidence suggesting that return to work testing was an integral part of the revised program.

### IV.

■ The collective bargaining relationships that exist between SEPTA and the railroad unions are governed by the Railway Labor Act. 45 U.S.C.A. § 151 *et seq.* "In general, if a proposed practice by a rail carrier is a clear departure from the collective-bargaining agreement, a dispute over the practice is treated as a major dispute under the Railway Labor Act, and the carrier may not proceed without first negotiating with the employee's representative." *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R.,* 802 F.2d 1016, 1017 (8th Cir.1986).

Under the collective bargaining agreements in effect when SEPTA issued 87–1,[15] an employee's use or possession of drugs and alcohol on the job was prohibited. Those suspected of drug use were subject to urine testing. *See supra* note 4 (Rule I and Rule 100I–A2). Under 85–1, off-duty employees who were subject to duty and suspected of being under the influence could be tested. *See supra* page 545. In addition, body fluid testing occurred upon signal rule violations and upon employee transfers or promotions to safety important jobs. Random testing did not take place. There is no evidence that the unions agreed to or acquiesced in widespread testing or to any significant testing without individualized suspicion.

The unions' acquiescence in suspicion-based, post-violation, transfer and promotion testing cannot be interpreted as an authorization or even foreshadowing of 87–1. *Brotherhood of Maintenance of Way Employees, Lodge 16,* 802 F.2d at 1023.

---

**15.** Return to work testing would also appear to be covered by the "major dispute" rule, but this issue is not dealt with in view of the determination that such testing is constitutionally impermissible.

Only "long standing practices" can be considered part of a collective bargaining agreement in determining whether a proposed change is "arguably justified" by the parties' agreement. *Switchmen's Union v. Southern Pacific Co.*, 398 F.2d 443, 447 (9th Cir.1968).

SEPTA proposes to test 45 percent of its operating employees at least once each year. The incidence, focus, rationale for, and employee impact of such testing is substantially different from 85–1, and it obviously will affect the working relationship of the parties. The proposal cannot be "arguably justified" by the terms of prior agreements or the parties' prior practice. The unions are correct that the proposed program constitutes a "major dispute," precipitating the notice and administrative requirements of 45 U.S.C.A. § 156. *Brotherhood of Locomotive Eng'rs. v. Burlington Northern R.R.*, 620 F.Supp. 163, 170–172 (D.Mont.1985), *appeal pending*, No. 85–4138 (9th Cir. argued July 8, 1986). *See Railway Labor Executives v. Norfolk & Western Ry.*, 833 F.2d 700, 707 n. 6 (7th Cir.1987). The status quo rule of Section 156, which is the centerpiece of the Act, is intended to encourage resolution through mediation and, if necessary, arbitration. *Detroit & Toledo Shoreline R.R. v. United Transp. Union*, 396 U.S. 142, 148–51, 90 S.Ct. 294, 298–99, 24 L.Ed.2d 325 (1969). *See Brotherhood of Maintenance of Way Employees, Lodge 16*, 802 F.2d at 1021.

The railway unions, for these reasons, are entitled to an injunction preserving the status quo.

## V.

■ Local 1594 of the UTU represents the bus and trolley operators of SEPTA's Red Arrow division under the Pennsylvania Public Employe Relations Act, 43 P.S. § 1101 *et seq.* Under 43 P.S. § 1101.701, public employers must bargain in good faith with the representative of their employees over wages, hours and other terms and conditions of employment. Local 1594 requests an injunction requiring SEPTA to fulfill that statutory duty before implementing the program. However, a failure

to bargain in good faith is an unfair labor practice under 43 P.S. § 1101.1201. Under 43 P.S. § 1101.1301, exclusive jurisdiction to prevent unfair labor practices is given to the Pennsylvania Labor Relations Board. *See Philadelphia Federation of Teachers v. Board of Education*, 24 Pa.D. & C.3d 211, 214–15 (1981). Federal courts lack subject matter jurisdiction over unfair labor practice claims that come within the board's jurisdictional purview. *Sellers v. Local 1598, Dist. Council 88, AFSCME*, 600 F.Supp. 1205, 1212–13 (E.D.Pa.1984), *aff'd*, 810 F.2d 1164 (3d Cir.1987). Local 1594's request for injunctive relief must be denied for lack of jurisdiction.

An order follows.

## ORDER

AND NOW, this 19th day of January, 1988 it is ordered:

1. The preliminary injunction entered February 9, 1987 is dissolved.

2. The request of plaintiffs Transport Workers' Union of Philadelphia, Local 234 and Transport Workers' Union of America, Local 2013 for a permanent injunction of SEPTA order no. 87–1, as revised, is denied, subject to the following:

a. "Operating Employees" shall not include "Conductors and Passenger Attendants" unless it is established that these are safety sensitive positions.

b. SEPTA order no. 87–1, as finally revised, shall be submitted to this court for review before it is promulgated, and random testing shall not be begun until after court review occurs.

c. This court shall retain jurisdiction to supervise the implementation of 87–1.

3. The request of all plaintiffs for a permanent injunction of SEPTA order no. 87–2 is granted.

4. The request of the Railroad Brotherhood plaintiffs for a permanent injunction of SEPTA order no. 87–1, as finally revised, is granted until such time as SEPTA complies with Section 156 of the Railway Labor Act, 45 U.S.C. § 151 *et seq.*

5. The request of the plaintiff Local 1594 of the United Transportation Union for a permanent injunction of SEPTA orders nos. 87–1 and 87–2 because of SEPTA's alleged noncompliance with the Pennsylvania Public Employe Relations Act is denied.