**Russell BOLDEN**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY.**

**Civ. A. No. 88–9156.**

United States District Court, E.D. Pennsylvania.

May 7, 1993.

---

H. Francis deLone, Jr., Neff & Associates, Philadelphia, PA, for plaintiff.

Richard S. Meyer, Michael Esposito, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for defendant.

## MEMORANDUM

LUDWIG, District Judge.

■ Following a jury verdict of $250,001 in favor of plaintiff Russell Bolden, defendant SEPTA moves for judgment as a matter of law,[1] or for full remittitur,[2] or for new trial.[3] Fed.R.Civ.P. 50, 59.

Plaintiff, a former SEPTA employee, was discharged in August, 1987 after testing positive for marijuana.[4] Almost a year later, in May of 1988, Local 234 of the Transport Workers Union and SEPTA negotiated a settlement of Bolden's grievance. Plaintiff would be re-instated upon passing a drug test and either participating in a rehabilitation program or undergoing substance abuse counseling and would receive one-half of his back pay. Plaintiff refused to return to work and, instead, filed this action claiming that the results of the drug test given him in 1987

---

**1.** Defendant moves for judgment notwithstanding the verdict, which is now referred to as judgment as a matter of law. *See* Fed.R.Civ.P. 50(b).

**2.** On a jury verdict form, the jury allocated $1 of the damages to the period before June 1, 1988 and $250,000 thereafter. Defendant moves for remittitur of the latter portion of the award.

**3.** A motion for judgment as a matter of law may be granted only if "the record 'is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief.' " *Rotondo v. Keene Corp.*, 956 F.2d 436, 438 (3d Cir.1992) (quoting *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir.1969)) (citation omitted). Remittitur is available only where the verdict is "so large as to offend the conscience of the court." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir.1989) (citation omitted). A new trial is limited to cases where a "miscarriage of

justice" would otherwise result. *Williamson v. Conrail*, 926 F.2d 1344, 1352 (3d Cir.1991).

**4.** Pursuant to a grievance arbitration with SEPTA following a non-drug related discharge in 1986, plaintiff had just been conditionally reinstated in May of 1987. On June 16, 1987 he was tested for drugs because of a new SEPTA "return to work" directive under which all employees absent from work for 30 days or more were required to undergo drug and alcohol testing as part of a physical examination. Although it was not disputed that a measurable amount of the active ingredient of marijuana was found in plaintiff's blood sample, there was evidence that it was much less than current positive reporting standards. Also, the amount of metabolite, four nanograms, was below the threshold subsequently adopted for this screen.

were inaccurate and the test requirement was unconstitutional.

In March of 1990, a jury found that SEPTA had violated plaintiff's Fourth Amendment rights and awarded damages of $285,000. On appeal, our Court of Appeals, *en banc*, noting that unconstitutionality was an issue for the court, made a judicial finding that the return to work test constituted a Fourth Amendment violation but ordered a new trial as to damages. *Bolden v. SEPTA*, 953 F.2d 807, 829 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992).[5] Specifically, the decision held that plaintiff was precluded from recovering damages for lost wages after June 1, 1988, the date on which he became eligible for reinstatement under the grievance settlement. *Id.* The damages left to be determined were lost wages from the date of his discharge in 1987 to June 1, 1988 together with his claims for emotional distress and loss of reputation.

At the second trial, in August, 1992, SEPTA contended that both the wage loss and the intangible damages were cut off by the grievance settlement.[6] Its secondary position was that any intangible damages related to unemployment after the grievance settlement were not recoverable. Its theory was that under the holding of the *en banc* opinion, Bolden had to be treated as though he had returned to work. If he had returned, he would not—SEPTA maintained—have had any further damages, economic or intangible, arising at least from being unemployed.

Much of the trial concerned the accuracy and significance of the substance abuse testing that occasioned plaintiff's discharge by SEPTA. The conclusiveness of the test results and the chances of passive inhalation were hotly disputed by expert witnesses. Plaintiff claimed that SEPTA had falsely, as well as unconstitutionally, labelled him a drug abuser, and that the terms of the grievance settlement had the effect of perpetuating that accusation.

At the close of trial, the sole question submitted to the jury was the amount of the intangible damages, and this submission was bifurcated.[7] First, over SEPTA's objection, the jury was asked to determine the amount of intangible damages caused by the constitutional violation, without regard to the grievance settlement. It returned a verdict of $250,001. Then, in a second phase, when asked to allocate the verdict between the periods before and after the grievance settlement, it apportioned $1 to "before" and $250,000 to "after." The jury had been instructed that an award of $1 was appropriate as symbolic damages for a constitutional violation.

SEPTA challenges the verdict as excessive, against the weight of the evidence, inconsistent with the jury instructions—and asserts that the instructions were inadequate and erroneous.

## I.

■ According to plaintiff, the stigma of being classified as a drug user ruined his life. He said he was "robbed" of his dignity, hope, self-esteem and spirit, that he could not find another job and was regarded as "a bum," and that an enormous strain had been put on him and his family. His testimony was corroborated by his wife, his 15–year old daughter, and two friends. Viewing this evidence in the light most favorable to plaintiff, *see Rotondo*, 956 F.2d at 438, the amount awarded for emotional harm and damage to reputation was not grossly excessive or "shocking to the conscience." *See Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1232 (3d Cir. 1989); *Morales v. Cadena*, 825 F.2d 1095, 1100 (7th Cir.1987) (remittitur as to compensatory damages for emotional distress or loss of future earning capacity refused).

---

5. *See also Bolden v. SEPTA*, 1991 WL 41909, 1991 U.S.App. LEXIS 5078 (3d Cir. April 1, 1991) (panel decision in which two judges, on different grounds, concurred in directing entry of judgment for defendant) (withdrawn by publisher), *vacated*, 1991 WL 41909, *24, 1991 U.S.App. LEXIS 7083 (3d Cir. April 23, 1991).

6. "Intangible damages" is used to refer to emotional distress and harm to reputation.

7. The lost wages were subsequently calculated by the parties to be $6,013.48.

## II.

■ For a constitutional rights violation, a plaintiff is entitled to compensatory damages for resulting intangible harm. *Memphis Community School District v. Stachura*, 477 U.S. 299, 306, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986); *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978). *Cf. Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108, 1121 (3d Cir.1988), *cert. denied*, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). While the standard of proof for emotional distress has been problematical, SEPTA's contention that the evidence in this case was legally insufficient is not well founded.

■ SEPTA refers to *Spence v. Board of Education*, 806 F.2d 1198, 1201 (3d Cir. 1986) (remittitur upheld where evidence of emotional distress was speculative, without deciding whether a verdict for such harm may rest solely on plaintiff's own testimony).[8] In the present case, plaintiff's portrayal of himself as a broken man was supported by the testimony of four other witnesses. Moreover, the unconstitutional administration of the drug test undeniably brought about extremely stressful consequences—the loss of a job, the lack of pay, the realization that SEPTA and, in turn, the union and others considered plaintiff to be a drug user. In the previous year, he had undergone a lengthy grievance procedure and had just been conditionally reinstated. As it turned out, in insisting on the drug test, SEPTA violated plaintiff's constitutional rights. Factors such as these, which objectively demonstrate a strong probability of stress, were conspicuously missing in *Spence*.

In *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A.2d 988 (1987), the Pennsylvania Supreme Court considered the legal standard of proof for emotional distress in a special, nontraditional context. In affirming the nonsuit of an action for intentional infliction of emotional distress brought under section 46 of the Restatement

(Second) of Torts, Chief Justice Nix concluded that if that section were to be adopted in Pennsylvania "at the very least, existence of the alleged emotional distress must be supported by competent medical evidence." *Id.*, 515 Pa. at 197, 527 A.2d at 995. This requirement of superior proof, however, is occasioned by the subjective and amorphous nature of the tort itself. Analytically, as with intentional torts generally, it is difficult to separate the injury from the offensive conduct. Yet in the case of intentional infliction, it is even harder to define in a concrete and objective way the liability predicate of "outrageousness." *Id.*, 515 Pa. at 197, 527 A.2d at 994–95. The reluctance to allow compensation for emotional distress based on subjective perception and unconfirmed testimony has much less application to a constitutional violation.

"The starting point for analyzing damages for violations of constitutional rights is the common law." *Parrish v. Johnson*, 800 F.2d 600, 606 (6th Cir.1986). If *Kazatsky* is at one extreme of the compensatory damages spectrum, the present case, which is closely akin to common law defamation, is at the other. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974) ("The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss."). As explicated in *Carey*, "those forms of defamation that are actionable *per se* are virtually certain to cause serious injury to reputation, and ... this kind of injury is extremely difficult to prove." 435 U.S. at 262, 98 S.Ct. at 1051. The intentional infliction cases are not helpful to defendant's position on proof of damages.

## III.

In remanding this case for a new trial limited to damages, the opinion of the Court of Appeals discusses the effect of the grievance settlement in two passages:

---

8. On this issue, *Spence* notes an apparent inter-circuit disagreement, which may be factually reconcilable. *See Chalmers v. Los Angeles*, 762 F.2d 753, 761 (9th Cir.1985); *Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267, 1272–73 (8th Cir.

1981). *But see Cohen v. Board of Education*, 728 F.2d 160 (2d Cir.1984); *Nekolny v. Painter*, 653 F.2d 1164 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982).

Consequently, we conclude that Bolden was bound by the terms of the settlement and that Bolden's rejection of reemployment on these terms cut off his right to damages for lost wages following that date. Because it is impossible to determine how much of the jury verdict was based on lost wages and emotional distress occurring after this settlement, we must reverse the award of damages and remand for a new trial on this issue.

\*    \*    \*    \*    \*    \*

In conclusion, we hold that SEPTA is not protected by the Eleventh Amendment, that the drug test administered to Bolden was unconstitutional, that SEPTA is not liable for wages lost by Bolden after the settlement between SEPTA and his union, and that punitive damages cannot be assessed against SEPTA under Section 1983.

*Bolden,* 953 F.2d at 829, 831 (citations omitted).

SEPTA complains that trial rulings and the jury instructions at the second trial erroneously conveyed the idea that it was liable for damages that occurred after the grievance settlement, particularly for job-related damages. Its premise is that the grievance settlement reinstated plaintiff as a SEPTA employee "by operation of law." (SEPTA's post-verdict brief at 7.) Therefore, SEPTA reasons, plaintiff had no post-settlement claim or, if he did, it was restricted to damages that would have been sustained if he had gone back to work at SEPTA pursuant to the settlement. While the remand opinion does not speak directly to this issue,[9] SEPTA's logic and conclusions appear to be faulty.

■ Whether or not plaintiff had returned to work, the grievance settlement did not cut off his Section 1983 claim. *Bolden,* 953 F.2d at 825–26. The union's authority to settle his wrongful discharge claim was limited to work related matters, including drug testing and other conditions of re-employment. *Id.* But

he of course, although bound by the terms of the settlement, was free not to return to SEPTA. The settlement occurred after this court declared the return to work testing unconstitutional. *Transport Workers Union, Local 234 v. SEPTA,* 678 F.Supp. 543 (E.D.Pa.1988), *aff'd,* 863 F.2d 1110 (3d Cir. 1988), *vacated,* 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 560 (1989), *reaffirmed,* 884 F.2d 709 (3d Cir.1989). As testified by a union representative, there were 40 grievances of discharges involving such drug testing, all of which were settled as a package. Bolden was the only grievant who objected to the settlement. Through his attorney, he had informed the union that he did not want it to represent him in this matter. Although, because of the test results the union representative did not believe him, Bolden insisted that he did not use marijuana. Given his awareness that the test had been held unconstitutional, it is not surprising that he chose to sue SEPTA for the civil rights violation and not to return to SEPTA on settlement terms that explicitly presupposed he had a drug problem.[10]

■ At trial, immediately following the union representative's testimony in regard to the grievance settlement, the jury was instructed as follows:

Members of the jury, let me give you some instructions at this point to explain some of the issues in the case. We've just heard the testimony given at an earlier hearing in this case by Mr. Ropars the representative of the union to which Mr. Bolden belonged.

This union, the Transportation Workers Union, represented all of the non-management employees at SEPTA. The union and SEPTA had an overall agreement that regulated their relationship. This overall agreement is called the collective bargaining agreement. The only parties to that agreement are the union and SEPTA as the employer. However, all of the mem-

---

9. However, the opinion states, at the two places quoted, that the specific effect of the settlement was to terminate plaintiff's claim for lost wages.

10. Moreover, by the time of the settlement, SEPTA also knew that plaintiff, who as a mainte-

nance custodian did not do safety-sensitive work, was not constitutionally subject to any SEPTA-ordered drug testing. *See Transport Workers' Union, Local 234 v. SEPTA,* 678 F.Supp. at 546–47 & n. 9.

bers of the union, as part of their membership, authorized the union to negotiate and to agree with the employer as to the terms of employment and working conditions.

Under the collective bargaining agreement, an employee, a union member, may not be discharged from his or her job without good cause. And, if an employee is discharged, a procedure exists, called a grievance procedure, in which the union may contest or fight the discharge.

If the dispute cannot be resolved; that is, settled through discussions, then there can be an arbitration at which three arbitrators, one chosen by each side and the third by the two so chosen, will hear the case and make a decision, a binding decision.

As you've heard, this is what happened in Mr. Bolden's case as to the Eichwald incident in 1986 and was about to happen as to the discharge in August 1987 based on the return to work blood test. At that point, as you've heard, the union and SEPTA reached a settlement.

Under the law the union has the power to not only represent its members at grievance proceedings, but also to make a settlement on their behalves. And, this is true whether or not the union member actually agrees with the position taken by the union in his or her case and whether or not the union member wants the union to be his or her representative in the dispute with the employer.

This arrangement that the union has the authority to represent its members in these disputes is part of the collective bargaining agreement and it's also a part of union membership. However, the union's authority to represent its members and to reach a settlement in a grievance proceeding is limited to the terms of employment and to working conditions; that is the subject matter of the collective bargaining agreement.

The union does not have the authority to represent its members and reach a settlement as to a claim that the employer violated the employees' constitutional rights or as to any other matter outside the scope of the collective bargaining agreement.

For these reasons that I've just gone over with you, Mr. Bolden's union had the authority to represent him in the grievance proceedings with SEPTA and to reach a settlement of the discharge dispute based on the return-to-work blood test, despite Mr. Bolden's objection to the union's representation and to settlement it reached with SEPTA. However, that settlement did not cut off or prevent him from making his claim in this lawsuit that SEPTA violated his constitutional rights by requiring him to take the return-to-work blood test in 1987. The effect of the settlement between the union and SEPTA was to cut off his claim for loss of wages from the date of the settlement and thereafter; in other words, from approximately June 1 of 1988. In other words, as part of his claim for damages based on the unconstitutional blood test in June of 1987, he can claim loss of wages until the date of the settlement about a year later, but not beyond that date. And he also cannot claim that he was prevented from working at SEPTA after the date of the settlement.

So, these are the effects of the union settlement in this case. And I'll give you further instructions on these issues later on when I submit the case to you for a decision.

The union could not require Mr. Bolden to return to work under the conditions set forth in the settlement, but Mr. Bolden cannot, in this case, claim any loss of wages beyond the date of the settlement or that SEPTA did not permit him to return to work pursuant to the terms of the settlement with the union.

Trial trans. Aug. 12, 1992, at 47–50.

As part of the final instructions, the jury was told:

As I instructed you yesterday, Mr. Bolden is bound by the terms of the union-SEPTA settlement as to his claim for lost wages and as to the terms of his employment with SEPTA, and he cannot claim any loss of wages after the date he became aware of the settlement. However, the settlement does not affect his claim for other damages caused by the constitutional violation, and I am submitting to you his

claim for emotional distress and harm to reputation for the periods both before and after the settlement and for the future. Jury Instr. Aug. 13, 1992, at 12.

The jury was also instructed that plaintiff was entitled to recover compensatory damages for actual harm sustained; that it was plaintiff's burden to prove that the harm was sustained and that the constitutional violation was a substantial causative factor; that the actual harm to be considered included emotional distress and harm to reputation; and that it was not to consider the amount of any lost wages, which the court would determine based on the grievance settlement.

It was left to the jury to consider the amount to be awarded plaintiff for intangible damages causally related to the constitutional violation. In this way, the question of the elimination or reduction of those damages resulting from the opportunity afforded plaintiff to return to work at SEPTA was for the jury to determine. On this point, both sides made closing argument. SEPTA's requested jury instructions—and its objections throughout the trial—were rejected because they posited that the issue of causation was a matter of law and not for the jury.[11]

## IV.

After the jury returned a verdict for plaintiff of $250,001, it was asked to make an apportionment between the periods before and after June 1, 1988. That date was the effective date of the settlement between SEPTA and the union. This request for allocation was submitted in light of SEPTA's position that all damages were cut off or at least limited after that date. The allocation made by the jury—$1 for the period before June 1, 1988 and the balance of $250,000 thereafter—produced a peculiar and seemingly inconsistent result. Since plaintiff was discharged in August, 1987 because of the unconstitutional drug test, it should follow that he sustained damages in the nature of emotional distress and harm to reputation from that date forward. For this reason, there is force to SEPTA's argument that the jury misunderstood the instructions at least as to apportionment.

The allocation instructions did little more than review the jury verdict form and identify the pertinent periods of time. "[T]he first period is from 1987, the time of the test, until the date of the union-SEPTA settlement.... The second period is for after the date of the settlement...." Trial trans. Aug. 14, 1992, at 5. Despite the apportionment, the court entered judgment in plaintiff's favor for $250,001.

Under Fed.R.Civ.P. 49(b), the court may submit to the jury both a request for a general verdict and written interrogatories on issues of fact.

When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pur-

---

11. SEPTA's sidebar objection to the reference in plaintiff's summation to plaintiff's future unemployability, made after the summation was completed, was overruled as belated. *Government of Virgin Islands v. Archibald*, 987 F.2d 180, 184 (3d Cir.1993). *But see Walden v. Illinois Central Gulf R.R.*, 975 F.2d 361, 366 (7th Cir.1992) (objection to statement in closing argument may be made during argument or at sidebar immediately thereafter). Nevertheless, in the context in which plaintiff presented the argument, the jury was asked to consider only the intangible damage aspects of plaintiff's claim, not any economic loss. Although the analogy is imperfect, there is an illustrative similarity between historical loss of earnings and loss of future earning power in a personal injury suit, on the one hand, and loss of earnings to the date of a labor grievance settlement and intangible constitutional violation dam-

ages, on the other. In a personal injury action, the lack of loss of earnings does not necessarily rule out the loss of future earning power. *Heckman v. Federal Press Co.*, 587 F.2d 612, 618 (3d Cir.1978). So, too, a labor grievance settlement that puts a cap on loss of past earnings should not preclude a claim for job related intangible damages in the future. Even if a plaintiff, for example, were constructively re-instated in a job, future employment permutations and contingencies would be hard to predict. If a jury decided that the effects of a constitutional violation were far-reaching and enduring, then, like loss of earning power, the intangible harm would survive the actual or constructive reinstatement and could be aggravated by employment developments in the future. All of these ponderables appear to be jury questions.

suant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

Fed.R.Civ.P. 49(b).

■■■■ The jury question on apportionment was in the nature of a special interrogatory. As emphasized in *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750 (3d Cir. 1990), "a trial court is 'under a constitutional mandate to search for a view of the case that makes the jury's answers consistent.'" *Id.* at 764 (quoting *United States v. 0.78 Acres of Land,* 81 F.R.D. 618, 621 (E.D.Pa.), *aff'd without opinion,* 609 F.2d 504 (3d Cir.1979)). If the jury's answers can be explained by a minimally plausible view of the case, the verdict shall be upheld. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962). Our Circuit has read *Atlantic & Gulf Stevedores* to mean that "a verdict must be molded consistently with a jury's answers to special interrogatories when there is any view of the case which reconciles the various answers." *Bradford–White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1159 (3d Cir.), *cert. denied,* 493 U.S. 993, 110 S.Ct. 542, 107 L.Ed.2d 539 (1989).

■■■ Here, the general verdict of $250,001 can stand by itself. The issue is whether that award was impaired and should be vacated by reason of the jury's answers to the allocation question. If the Court of Appeals, on the remand, intended to confine intangible damages to the pre-settlement period or otherwise to limit them as a matter of law, the general verdict can not be upheld. If, on the other hand, the remand was not so conditioned, every reasonable attempt should be made to explain the apportionment so that the general verdict will not be impugned or vitiated.

The amount of the general verdict reflects that the jury believed the award should include both symbolic, or nominal, damages and compensatory damages. The evidence as to the grievance process, culminating in the settlement some 10 months after plaintiff's discharge, might well have created the impression that plaintiff's case was pending and undecided during that time period.

Conceivably, the jury awarded $1 for the constitutional violation believing that it occurred upon plaintiff's discharge. It may have also believed that until the settlement occurred—with its conditions that arguably stigmatized plaintiff as a drug user—plaintiff's position that he did not use drugs could have been vindicated. Once the settlement was reached, that triggered his claim for intangible harm. He could no longer tell his friends and family, or himself, that he had a chance to have the slate wiped clean and to return to work as though the drug test had never been given. From that day on, the results of the drug test were a closed issue—and he had been administratively "convicted" of using marijuana. In the mind of the jury, compensatory damages may have accrued at this point.

Moreover, in this case, when SEPTA required Bolden to undergo the return to work drug testing in June of 1987, the constitutionality of SEPTA Directive 87–2 had not been determined. As the jury was informed, the return to work test was ruled to be an unreasonable search in 1988 after 87–2 had been in effect for about a year. Jury instr. Aug. 13, 1992, at 5–6. The decision that held 87–2 to be unconstitutional led to the union's settlement of Bolden's grievance. The jury may well have thought it unreasonable to impose damages on SEPTA for the period of time before 87–2 was invalidated and the grievance settlement was reached. Support for this view may also have come from another aspect of the case. The jury knew that the union had the power to bind Bolden to employment conditions with SEPTA, including drug testing, and that it did so, at SEPTA's insistence, as part of the settlement of all of the return to work drug test grievances. In this way, the union agreed on behalf of its members and bound them to conditions in-

cluding return to work drug testing even though their discharges arose from return to work tests recently found to be unconstitutional. Given that history, to assess compensatory damages for the period before the settlement, may have seemed unjustified.

Both of these issues, the legal interrelation between the constitutional violation and the grievance settlement and the evolution of employee drug testing at SEPTA, were before the jury during its deliberations. Considering the complexity of these issues and the facts of the case, the jury could have plausibly concluded that the award of compensatory damages should begin as of the effective date of the grievance settlement. In this sense, the jury appears to have attempted to have dealt fairly with SEPTA by not awarding damages for a period in which the law was unsettled and before the settlement that Bolden refused to accept.

### V.

SEPTA's other contentions are also rejected. Matters relating to Bolden's prior emotional condition, his dissemination of information about his discharge and this case, and the requirements of Pennsylvania's unemployment security law to contest a compensation claim were submitted to the jury as causation questions. SEPTA's positions ignored the major premise that it was liable for the unconstitutional drug test. The proposition that follows is that the intangible damages issues, if properly evidenced, were for the jury based on substantial-factor causation.

For these reasons, SEPTA's post-verdict motions were denied.