**AMALGAMATED TRANSIT UNION, LOCAL 993, an Unincorporated Association, et al., Plaintiffs,**

v.

**The CITY OF OKLAHOMA CITY, a Municipal Corporation, d/b/a The Central Oklahoma Transportation and Parking Authority, et al., Defendants.**

No. CIV–86–2182–A.

United States District Court, W.D. Oklahoma.

Sept. 6, 1988.

David M. O'Dens, George J. McCaffrey, Lampkin, McCaffrey & Tawwater, Oklahoma City, Okl., for plaintiffs.

Diane Davis Huckins, Gerald S. Rakes, Asst. Mun. Counselor, Oklahoma City, Okl., for the City of Oklahoma City, Okl.

Patricia Sellers Dennis, Oklahoma City, Okl., for John T. Patillo, Steven C. Klika, Mark E. Glandon and Phillip E. Hanley.

## ORDER

ALLEY, District Judge.

This is a civil rights action, filed pursuant to 42 U.S.C. § 1983, challenging the program of urinalysis for drug testing instituted by the defendant, the Central Oklahoma Transportation and Parking Authority (COTPA). The plaintiffs, Amalgamated Transit Union Local 993 (a union of COTPA employees) and its president, Omega Robinson, contend that COTPA's program violat-

ed their rights under the Fourth Amendment by subjecting them to an unreasonable search. The plaintiff union seeks a declaratory judgment that COTPA's program is unconstitutional and an injunction barring further testing. The plaintiff Robinson claimed damages on account of the urinalysis testing to which he submitted.

In February, 1988, trial was held on both the claims of the union and Robinson. Robinson's claim was submitted to a jury, and the claims of the union were tried to the Court. The jury returned a verdict against Robinson and in favor of the defendant COTPA, and the Court took the claims of the union under advisement. The Court now issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact

COTPA is a public trust whose beneficiary is the City of Oklahoma City. Among other enterprises, COTPA operates a mass-transit system providing bus service in the Oklahoma City area. It employs individuals to drive, maintain, and repair buses and has an administrative and management staff.

On September 10, 1986, COTPA announced the program at issue by means of two memoranda signed by its executive director John P. Patillo and distributed to COTPA employees. The first of these described COTPA's "physical examination policy." The second set forth a more specific "alcohol and substance abuse policy."

The physical examination memorandum declared that "because of many factors, management has determined it prudent to have periodic physical examinations conducted for each employee directly involved in the operating, maintaining, and decision-making concerning the public transit service." It informed employees that such examinations would be performed in the near future and, beginning July 1, 1987,

during the months of employees' respective birth dates. The memorandum asserted that such examinations were authorized by the collective bargaining agreement between the union and COTPA and that "drug/alcohol testing shall be included in the examinations." Employees were given a direct order to submit to the examination and testing and informed that refusal to submit "is insubordination and may result in disciplinary action up to and including termination." The Memorandum lists specific positions that are to be tested.[1]

The second memorandum discussed the alcohol and drug testing policy in more detail. It explained the reasons for the testing as follows:

> From knowledge gained from the media, newspapers, magazines, past employee experiences, et cetera, indications are that drug abuse (including alcohol) is increasing. As our organization is involved in the work that directly exposes the citizens to situations to which safety is critical, an employee abusing drugs or alcohol can be a hazard to the public, as well as other employees. As a public entity, we cannot ignore the possibility of a drug problem and its potential consequences.

The memorandum also stated that the testing "is not intended to be punitive in nature" and that reports of drug abuse would not be used for criminal prosecution.

Attached to the second memorandum was a document entitled "Central Oklahoma Transportation and Parking Authority Alcohol and Drug Abuse Policy." That document set forth eight instances in which COTPA employees would be required to submit to alcohol and/or drug testing:

1. At the time of the pre-employment physical examination.

2. At the time of any work related physical examination.

---

1. These positions are: Executive Director, Assistant Executive Director, Director of Administration, Directors of Transportation, Director of Parking, Planning and Marketing Manager, Chief of Operations, Chief of Maintenance, Coordinator of E. & H., Superintendent of Maintenance, Material Resources Coordinator, dispatchers, route supervisors, foremen, operators, maintenance personnel, service personnel, utility maintenance personnel, and parts personnel.

3. When two supervisors concur that the employee appears to be acting in an intoxicated or impaired manner.

4. When an employee is involved in a vehicle accident involving:

    a. A pedestrian

    b. A fixed object

    c. Two or more COTPA vehicles

    d. A COTPA vehicle striking the rear of another vehicle

    e. A head-on collision

    f. A COTPA vehicle striking another vehicle broadside

    g. Substantial physical damage (combined physical damages in excess of $1,000.00)

    h. Personal injury

5. When an employee is involved in an industrial accident which, in the sole discretion of management, it appears carelessness, poor judgment, or lack of alert mental facilities may have contributed to the accident.

6. When an employee is in flagrant violation of standard operating or safety procedures.

7. As a condition of discipline due to a previous alcohol or drug related offense.

8. When an employee returns from any unscheduled absence from work whereby two or more consecutive days of absence occurred, the employee may be required to submit to a test.

The memorandum also explained the consequences of a positive test for alcohol or drugs. For alcohol, a positive test of an employee on probation would result in immediate discharge. The consequences for a nonprobationary employee depended upon the amount of alcohol detected, and ranged from a three month suspension without pay up to immediate discharge. When an employee tested positive for drugs, the announced consequence was immediate discharge, without regard to probationary or nonprobationary status or to the level detected.

COTPA's policy offered employees the opportunity to enroll in a rehabilitation program referred to as the "Employee Assistance Program." Employees with drug and alcohol abuse problems who voluntarily enrolled in the program were not subject to the normal disciplinary consequences. Instead, they were referred to outside agencies for evaluation and counseling and were placed on probationary status. Restoration to full employment status was within the discretion of COTPA management. Employees in this program were required to submit to drug/alcohol as well as psychological testing at the discretion of management in order to determine their fitness for duty. The policy provided that testing might be required up to one year after the employee completed the recommended course of treatment.

According to COTPA's executive director, John T. Patillo, the impetus for drug urinalysis testing was a series of reports received by COTPA management that its employees were selling and using illegal drugs on the job. These reports began in February 1984, when Patillo was informed that about ten employees were selling and using such drugs. COTPA took no direct action against them but did initiate a policy of requiring job applicants to submit to testing during a pre-employment physical. In October 1984 and in early 1985, Patillo received similar reports, and, in response to this information, announced that COTPA would begin a program of random drug urinalysis testing. This proposal was withdrawn in December 1985 after Patillo discovered that the constitutionality of a random program had not yet been resolved. COTPA management decided to adopt the program here at issue after attending an industry conference on drug abuse in July, 1986. They patterned their program after the regulations of the United States Department of Transportation.

Beginning September 22, 1986, some 160 employees in the affected positions underwent the required physical examinations and testing. Employees were required to sign consent forms stating that they agreed to both the examination and the testing and authorizing the release to COTPA of medical information discovered during the examinations. The consent forms stated that refusal to consent to either the examination, the urinalysis testing, or the

disclosure of information to COTPA would be considered grounds for termination.

The Industrial Health Management Service (IHMS) located at Presbyterian Hospital in Oklahoma City conducted the physical examinations. Thorough medical, occupational, social, and family histories were obtained. Examinations included a complete review of the eyes, the ears, nose and throat, and the cardiovascular, respiratory, musculo-skeletal, genital-urinary, and central nervous systems. In addition to the drug urinalysis testing, urine was occasionally analyzed for diabetes if other signs of that disease were discerned. If evidence of any disease or risk factors associated with disease were discovered, the employee in question was informed of the discovery and referred to his or her private physician.

During the course of the physical examinations, urine samples were obtained as follows. The employees were given plastic cups and shown to a bathroom in the hospital. They were told to urinate into the cup and return to the examination room. Ordinarily, employees were not witnessed during the act of urination, but in instances in which it was suspected that a particular employee might offer a fraudulent sample, a physician's assistant would accompany an employee into the bathroom where the sample would be collected. Only one instance of the latter procedure was presented in evidence. When the employees returned to the examining room, IMHS personnel transferred the sample to a plastic vial. The vials were then labeled and IHMS personnel filled out chain of custody forms for each vial. The samples were placed in tamper-proof envelopes and mailed to Laboratory Specialists, Incorporated, in Belle Chase, Louisiana, for urinalysis testing.

Upon receipt of the samples from IMHS, laboratory technicians at Laboratory Specialists, Inc. conducted visual examinations of the envelopes containing the vials to insure that the envelopes had not been opened or tampered with. Information on the chain of custody forms was then compared with that on the vials containing the urine. If the information was satisfactory and it appeared that an adequate sample

had been obtained, the sample was sent to the laboratory for testing.

The samples were tested for presence of some thirty metabolites of various drugs. Various testing methods were used. First the samples were subjected to thin layer chromatography. According to testimony introduced at trial, this method is about ninety-five percent accurate, producing perhaps five percent false positive or negative results. The samples that tested positive for pertinent metabolites were subjected to additional testing methods. If a particular sample was found to contain metabolites of marijuana, it was subjected to immunoassay techniques. Samples testing positive through this method were then tested by the method of gas chromatography/mass spectroscopy. In the case of drugs other than marijuana, a positive test under the first method was followed directly by testing by means of gas chromatography/mass spectroscopy. The evidence presented at trial established that the combination of these methods resulted in nearly one hundred percent accuracy in the detection of positive samples.

It was emphasized at trial that all of these tests detect only the metabolites of the sought-for drugs. The tests cannot establish when the individual ingested the drug in question. According to Dr. Robert Willette, a medicinal chemist who testified at trial, the smoking of one marijuana cigarette might produce a positive urinalysis two to three days after it was ingested. Dr. Willette further testified that a heavy marijuana user might test positive up to one week after he had last ingested marijuana.

Thus, the tests could not establish that a particular employee was impaired to any certain degree when he provided the urine sample. However, according to the uncontroverted testimony of Dr. Willette, there is no recognized safe level of drug metabolites in the urine and "if the drug is present, it could affect that person." Dr. Willette also stated with regard to marijuana that levels of its metabolites in the urine reflect the level of its active ingredient THC in the blood, and that levels of THC in the blood

are correlated with impairment. In the words of Dr. Willette, the urine concentration will give you "some level of probability that THC is present in the blood."

After testing, Laboratory Specialist, Inc. destroyed the samples that tested negative. Samples that tested positive after the confirming tests were kept for a year. Reports of the tests were sent only to COTPA's executive director and COTPA's personnel director. The results were not distributed to law enforcement personnel.

Of the hundred and sixty employees subjected to urinalysis testing during physical examinations in September, 1986, five tested positive for drugs. These employees were given the option of termination or entry into the Employee Assistance Program. Three of the five declined to enter the program and were terminated. The other two were eventually terminated when, during their participation in the program, they tested positive again.

### Conclusions of Law

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searchs and seizures, shall not be violated and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment applies to the states and their subdivisions through the due process clause of the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1952). It governs the conduct of civilian authorities as well as law enforcement officials. *New Jersey v. T.L.O.,* 469 U.S. 325, 335–337, 105 S.Ct. 733, 739–740, 83 L.Ed.2d 720 (1985). Accordingly, governmental employers, including municipally operated bus companies, must comply with the Fourth Amendment. *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987) (plurality opinion); *Feliciano v. City of Cleveland,* 661 F.Supp. 578, 582 (N.D. Ohio

1987); *Amalgamated Transit Union Local 1277, AFL–CIO v. Sunline Transit Agency,* 663 F.Supp. 1560, 1565–1566 (C.D. Cal.1987).

Fourth Amendment analysis generally proceeds in two steps. First, the court must determine if the governmental conduct at issue was a search. If the conduct was a search, the Court must then determine whether the search was reasonable. *See National Federation of Federal Employees v. Carlucci,* 680 F.Supp. 416, 431 (D.D.C.1988).

### I. *Urinalysis Testing Is A Search*

■ The first question does not require a detailed analysis. Under the Fourth Amendment, a search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). In the instant case, the Court finds that COTPA's program of urinalysis testing infringes upon the reasonable expectations of privacy of COTPA employees in several respects. First, the program infringes upon the employees' expectations of privacy surrounding the act of urination. As the Fifth Circuit has written:

> There are a few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.

*National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 175 (5th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988). Although, as noted above, the collection of urine samples was not witnessed unless there were grounds for believing that a particular employee might submit a false sample, COTPA employees were directed to urinate at a particular time under particular conditions. COTPA's program thus intruded upon its employees' reasonable expectation of privacy in the act of urination.

Further, the Court finds that COTPA employees had a reasonable expectation of

privacy in the information that their urine contained. A urine specimen can be analyzed to reveal whether an individual is under treatment for depression, epilepsy, diabetes, or even schizophrenia. *Von Raab,* 816 F.2d at 176. It can also reveal whether a woman is pregnant. Employees do not reasonably expect to be required to reveal this kind of information to their employers. The Court thus concurs with the large number of courts that have held that drug analysis testing such as that conducted by the defendant COTPA constitutes a search under the Fourth Amendment. *See Railway Labor Executives' Association v. Burnley,* 839 F.2d 575 (9th Cir.1988); *Jones v. McKenzie,* 833 F.2d 335, 338 (D.C. Cir.1987); *National Federation of Federal Employees v. Weinberger,* 818 F.2d 935, 942 (D.C.Cir.1987); *McDonell v. Hunter,* 809 F.2d 1302, 1307 (8th Cir.1987); *Feliciano,* 661 F.Supp. 578, 584–586; *Amalgamated Transit Union,* 663 F.Supp. 1560, 1567 (C.D.Cal.1987).

### II. *Reasonableness*

The Court must now determine whether the drug urinalysis testing conducted by COTPA was reasonable under the applicable Fourth Amendment standard. Generally, a nonconsensual search is considered reasonable only if it has been authorized by a valid search warrant. *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). In addition, a search must ordinarily be based upon probable cause to believe that a violation of the law has occurred. *New Jersey v. T.L.O.,* 469 U.S. at 340, 105 S.Ct. at 742. Nevertheless, certain searches conducted in the absence of a warrant may be considered reasonable in clearly defined classes of cases, particularly when "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *O'Connor,* 107 S.Ct. at 1499 (quoting *Camara,* 387 U.S. at 529, 87 S.Ct. at 1731). A lesser standard than probable cause may also be sufficient to justify the search in some situations. *T.L.O.,* 469 U.S. at 351, 105 S.Ct. at 747.

In two recent decisions, the Supreme Court has described situations in which the warrant and probable cause requirements of the Fourth Amendment are not necessary to render a search reasonable. In *T.L.O., supra,* the Court held that school officials need not obtain a warrant in order to search a student under their authority. 469 U.S. at 336, 105 S.Ct. at 740. The Court further held that such searches could properly be based on suspicions that "although reasonable, do not rise to the level of probable cause." *Id.* at 341, 105 S.Ct. at 742. "The legality of a search of a student," the Court stated "should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 342, 105 S.Ct. at 743.

Similarly, in *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), the Supreme Court determined that a public employer is not required to obtain a warrant prior to searching, for work-related purposes, its employees' offices, desks, and file cabinets. It reasoned that requiring a warrant in such instances would "seriously disrupt the routine conduct of business and would be unduly burdensome." *Id.* 107 S.Ct. at 1500. As in *T.L.O.,* the Court found that the probable cause requirement did not apply, holding that "public employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work related misconduct, should be judged by the standard of reasonableness under all the circumstances." *Id.* 107 S.Ct. at 1502.

Although the Supreme Court in *O'Connor* expressly declined to address the proper Fourth Amendment standard for drug and alcohol testing of public employees, the Court finds that the reasoning of the Supreme Court in *O'Connor* and *T.L.O.* establishes that a governmental employer is not required to obtain a warrant before conducting drug urinalysis testing. It is not disputed by the parties here that evidence of drug usage diminishes as the body metabolizes and excretes the substances consumed. If an employer suspecting employees to be under the influence of drugs were required to obtain a warrant

before subjecting them to testing, the evidence sought might well be significantly diminished or even completely dissipated by the time the warrant was procured. *See Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1833–1834, 16 L.Ed.2d 908 (1966).[2] Thus, under *T.L.O.* and *O'Connor,* the proper Fourth Amendment standard is whether COTPA's testing program was reasonable under all the circumstances.[3]

This test of reasonableness involves a two-fold inquiry. First, the Court must determine if the search in question was "justified at its inception." *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742 (quoting *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968)). Second, the Court must consider whether the search "as actually conducted, was reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742.

### A. Justification at Inception

In order to determine whether the search was justified at its inception, the Court must first assess "the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen." *Terry,* 392 U.S. at 20–21, 88 S.Ct. at 1879–1880 (quoting *Camara,* 387 U.S. at 534–535, 87 S.Ct. at 1733–1734). The government interest at stake must be balanced against the privacy interest intruded upon. If the government interest does not outweigh the protected privacy interest, the search is not justified at the inception and is not reasonable. *See Terry,* 392 U.S. at 21, 88 S.Ct. at 1879–1880.

In the case at bar, the compelling nature of the governmental interest is apparent.

Drug abuse by employees responsible for public transportation poses serious risks to other employees and to the public. As one court has written, "One chemically induced accident can result in death or serious injury to dozens of passengers." *Amalgamated Transit Union Local 1277,* 663 F.Supp. at 1569. The courts that have considered urinalysis testing of public transportation employees are in agreement that the interest in safe transportation is compelling. *See Jones,* 833 F.2d at 338; *Transport Workers' Union of Philadelphia Local 234 v. Southeastern Pennsylvania Transportation Authority,* 678 F.Supp. 543, 549 (E.D.Pa.1988); *American Federation of Government Employees v. Dole,* 670 F.Supp. 445, 448 (D.D.C.1987).

Balanced against this public interest are the reasonable expectations of privacy surrounding the act of urination and the information disclosed by urinalysis, both of which are intruded upon by COTPA's testing program. In light of these conflicting interests, the Court must undertake a more particularized inquiry in order to determine whether COTPA's program was justified in its inception; it must determine whether, prior to the program's adoption, there were reasonable grounds for suspecting that urinalysis testing would turn up evidence that its employees were implicated in work related drug abuse. *Railway Executives' Association,* 839 F.2d at 587.

A conflict exists in case law as to whether this reasonable suspicion must be focused on a particular employee. In both *T.L.O.* and *O'Connor,* the Supreme Court declined to resolve the question of whether individualized suspicion is required in order to justify searches of students by school authorities and of public employees by

---

**2.** In fact, every decision the Court has located concerning drug urinalysis testing has held that a warrant is not required before such testing can be conducted. *See, e.g., Railway Labor Executives' Association,* 839 F.2d at 582; *Policemans' Benevolent Association of New Jersey, Local 318 v. Township of Washington,* 672 F.Supp. 779, 839 (D.N.J.1987). The Court is in agreement with the reasoning of these cases.

**3.** The Court's conclusion that a warrant was not required to render COTPA's program reasonable

is based on the reasoning of *O'Connor* and *T.L. O.* and not on the administrative search exception to the warrant requirement. This case does not involve a pervasively regulated industry, as did *Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir.), *cert. denied,* 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) (holding that urinalysis testing of jockeys does not violate the Fourth Amendment). *See Railway Labor Executives' Association v. Burnley,* 839 F.2d at 583–586.

their employers. In cases involving drug urinalysis testing, the Courts of Appeal have reached differing conclusions. Compare *Jones*, 833 F.2d at 338, *National Treasury Employees Union*, 816 F.2d at 176, with *Railway Executives' Association*, 839 F.2d at 587. A number of district court decisions have agreed with the Ninth Circuit's conclusion that such individualized suspicion is required. *See, e.g., Feliciano* 661 F.Supp. at 586; *Lovvorn v. City of Chattanooga*, 647 F.Supp. 875, 879 (E.D. Tenn.1986); *Taylor v. O'Grady*, 669 F.Supp. 1422, 1431 (N.D.Ill.1987); *but see Wrightsell v. City of Chicago*, 678 F.Supp. 727, 734 (N.D.Ill.1988).

In the case at bar, COTPA acknowledges that its testing program was not administered on the basis of individualized suspicion. Although COTPA officials received reports of drug use by particular employees, regular urinalysis testing was conducted not just on these employees but on all COTPA employees holding certain positions. The union contends that since employees were required to undergo testing in the absence of such individualized suspicion that they were using drugs on the job, COTPA's program was not justified in the inception and thus violated the Fourth Amendment.

The Court does not agree that such individualized suspicion was necessarily required here. Although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure, the Fourth Amendment imposes no irreducible requirement of such suspicion." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560–561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976); *see also Camara*, 387 U.S. at 523, 87 S.Ct. at 1727. In *O'Connor, supra*, the Supreme Court explained that individualized suspicion is not required when: (1) the privacy interests implicated by the search are minimal and (2) "other safeguards are available to insure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field." *Id.* at 743 (quoting *Delaware v. Prouse*, 440 U.S. 648, 654–655, 99 S.Ct. 1391, 1396–1397, 59 L.Ed.2d 660

(1979)). The Court turns to a consideration of these factors.

### 1. *Extent of the Privacy Interest*

The Court finds that a number of factors served to minimize the intrusiveness of COTPA's testing program. Most importantly, the testing at issue here was conducted in the context of medical examinations. In the course of such an examination, even if it does not include urinalysis, one is called on to disclose information not generally disclosed to the public, to uncover certain parts of the body not normally displayed, and, in general, to surrender for the sake of the diagnostic purposes of the examination, some of the reasonable expectations of privacy that one possesses in other situations. If one's reasonable expectations of privacy in a medical examining room were not reduced to some degree, few examinations could occur without offense to one's privacy and dignity.

The examinations conducted pursuant to COTPA's program were bona fide. A number of significant conditions and risk factors having nothing to do with drug usage were identified during the course of these examinations, and this information was significant to COTPA's obligation to provide safe public transportation. The fact that urinalysis represented one of several inquiries into the fitness of COTPA employees for duty lessens the sense of intrusiveness of the testing program standing alone. *See Jones*, 833 F.2d at 339–340; *Wrightsell v. City of Chicago*, 678 F.Supp. 727 (N.D.Ill.1988).

In addition, the advance notice provided to COTPA employees about the physical examinations reduces the urinalysis program's intrusiveness. *See National Federation of Federal Employees*, 818 F.2d at 943; *Transportation Workers' Local 234 v. Southeastern Pennsylvania Transportation Authority*, 678 F.Supp. 543, 550 (E.D.Pa.1988). As noted above, COTPA employees were put on notice that management might require physical examinations by the provisions of the collective bargaining agreement. Although the Agreement did not specifically mention urinalysis, that procedure is only one of a

number of intrusions that anyone experiences in any physical examination. It is a rare person who has not had palpation for breast lumps or inguinal hernia, or a PAP smear or a prostate check. The Court also finds it significant that COTPA employees were given approximately two weeks notice of urinalysis testing in particular. This is not a case in which employees were suddenly rounded up and ordered to submit to testing. Compare *Capua v. City of Plainfield*, 643 F.Supp. 1507 (D.N.J.1986); and *Lovvorn*, 647 F.Supp. 875, 879 (E.D.Tenn. 1986).

Further, some consideration should be given to the positions held by those who are tested. The privacy interests protected by the Fourth Amendment are those that society considers reasonable, and people who have chosen to work in public transportation may well have a reduced expectation of privacy about matters impacting on the public safety. This is one explanation of the jury's verdict in favor of COTPA and against the plaintiff Robinson.

These factors demonstrate to the Court that COTPA's program was designed and administered in such a way as to significantly lessen the intrusiveness of urinalysis testing. The Court finds that the program implicated privacy interests so minimally that individualized suspicion was not required to justify urinalysis.

### 2. *Safeguards to Protect From Official Discretion*

Upon a review of the record, the Court finds the safeguards accompanying COTPA's program to afford employees sufficient protection from the exercise of discretion by COTPA management. Testing is to be conducted only upon the occurrence of a number of specific, readily identifiable events (i.e. the passing of his or her birth month, his or her involvement in an accident, and evidence of his or her impairment on the job). The methods for the collection of samples, the transfer of samples from IHMS to a testing laboratory, and the tests that are used to analyze the samples are standardized in the policies of COTPA, IHMS and Laboratory Specialists, Inc. and

are not subject to the discretion of COTPA management. The disclosure of the information revealed by the tests is also subject to regulations that protect COTPA employees from the discretion of those conducting the tests.

Accordingly, because of the factors minimizing the intrusiveness of COTPA's testing program and the safeguards protecting COTPA employees from management's discretion, the Court concludes that individualized suspicion of COTPA employees was not required in order to justify urinalysis testing of COTPA employees at its inception. The Court must now determine if, at the inception of the testing program, COTPA management possessed reasonable grounds to suspect that the testing would turn up evidence of work related drug abuse in the work force as a whole.

### 3. *General Evidence of Drug Use*

As to this issue, the Court finds the testimony of COTPA's executive director John T. Patillo to support the proposition that such reasonable grounds existed. As noted above, Patillo testified that he received reports that certain COTPA employees were using drugs on the job. He found the reports credible, and they continued over a period of time. While the reports involved, at the most, only ten to eleven employees (roughly five percent of the total number of employees that were eventually required to submit to testing in September 1986), this number is not insignificant.

In assessing the significance of such reports, the Court finds that some consideration of the gravity of the harm that could be inflicted even by one drug impaired employee should be considered.[4] In the case of employees responsible for the operation, maintenance and repair of city buses, the gravity of harm is obvious. The possibility that ten or eleven employees could be impaired on the job could not be ignored by responsible management. *Cf. Taylor v. O'Grady*, 669 F.Supp. at 1429 (evidence that three percent of a group of correction-

---

**4.** A similar principle is applied in tort law in determining a party's negligence. *See Restate-* *ment of Torts 2d* § 293; *United States v. Carroll Towing Co.*, 159 F.2d 169 (2d Cir.1947).

al employees were using illegal drugs and that one tenth of this group might be serious abusers held to justify a urinalysis testing program in its inception in the absence of individualized suspicion). Accordingly, the Court concludes that the evidence set forth by Mr. Patillo was sufficient for him to conclude that urinalysis testing would disclose evidence of work related drug abuse, thus justifying the search at its inception.

### B. Reasonably Related In Scope

Under the second prong of the reasonableness test, the Court must determine whether the search as actually conducted was reasonably related in scope to the circumstances that justified the interference in the first place. *T.L.O.*, 469 U.S. at 341–342, 105 S.Ct. at 742–743 (quoting *Terry v. Ohio*, 392 U.S. at 20, 88 S.Ct. at 1879). The Court must consider whether the measures adopted by the governmental agency or officer are reasonably related to the objectives of the search and not excessively intrusive. *Id.* 469 U.S. at 342, 105 S.Ct. at 743; *Railway Labor Executives' Association*, 839 F.2d at 588.

Several courts that have considered this matter have concluded that drug urinalysis testing does not meet this prong of the reasonableness test. *See, e.g., Railway Labor Executives' Association*, 839 F.2d at 588–589; *Taylor v. O'Grady*, 669 F.Supp. at 1437–1439. These cases reason that such tests are "not reasonably related to the stated purpose of the tests because the tests cannot measure current drug intoxication or degree of impairment." *Railway Labor Executives' Association*, 839 F.2d at 588–589.

In the Court's opinion, these decisions view the purpose of drug urinalysis testing too narrowly. The ultimate purpose of such testing is not, at least in the case at bar, to measure levels of impairment. Rather, the purpose is to protect the safety of COTPA employees and those members of the public who use the transportation that COTPA provides. Thus, accepting the proposition that urinalysis testing does not measure on the job impairment, it does not follow that such testing is not reasonably related to the purpose of improving public safety.

In fact, the evidence presented in the instant case establishes that there is some relationship between a positive drug urinalysis test and impairment on the job. Specifically, the Court takes note of Dr. Willette's testimony that there is no known safe level of drug metabolites in the urine and that if such metabolites are present the individual could be affected by the drug. The tests here at issue do determine whether an employee has ingested substances of which there is no known safe level and which might affect his or her ability to perform a job directly affecting public safety. The Court thus finds that they bear a reasonable relationship to the purpose of providing safe public transportation.

Further, the Court finds that COTPA's program is also reasonably related to the purpose of preventing drug abuse on the job. The program subjects employees who use drugs to disciplinary action and thus serves to discourage such drug use. A number of courts have recognized the preventive purpose of drug urinalysis testing programs as a legitimate one, and the Court agrees. *See, e.g., Von Raab*, 816 F.2d at 180; *American Federation of Governmental Employees v. Dole*, 670 F.Supp. 445, 448 (D.D.C.1987).

Finally, the Court finds that COTPA's program was not excessively intrusive in light of its purposes. With regard to the issue of excessive intrusiveness, a number of courts have focused upon the availability of alternative means of detecting drug abuse that are less intrusive and, to some, more effective than drug urinalysis testing. *See, e.g., Taylor v. O'Grady*, 669 F.Supp. at 1438; *National Federation of Federal Employees v. Carlucci*, 680 F.Supp. 416, 429–430. The Court does not agree with the reasoning of these cases, for under the requisite Fourth Amendment analysis, "The determination of reasonableness does not necessarily or invariably turn on the existence of alternative, less intrusive means." *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 742, 93 L.Ed.2d 739 (1987) (quoting *Illinois v. Lafayette*, 462

U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed. 2d 65 (1983)). In this instance, since COTPA has demonstrated that its drug urinalysis testing program bears a reasonable relationship to the objective of improving public safety, the availability of alternative means of detecting work related drug abuse does not render the testing program unreasonable under the Fourth Amendment.

For the foregoing reasons, the Court finds that COTPA's program was both justified in its inception and reasonably related in scope to its objective of improving public safety. The searches of COTPA employees conducted pursuant to the program were thus reasonable and did not violate the Fourth Amendment.[5]

### Related Case Law

As noted above, the Supreme Court has not yet determined the Fourth Amendment standard applicable to the drug urinalysis testing of public employees in positions impacting upon the public safety. Case law in this area has reached conflicting conclusions, and the decisions each involve "a subjective analysis of objective factors." *Amalgamated Transit Union Local 1277*, 663 F.Supp. at 1569. Nevertheless, the Court finds its decision supported by several recent decisions that have considered drug urinalysis testing pursuant to bona fide medical examinations and testing of employees involved in public transportation.

The closest case is *Jones v. McKenzie, supra.* In *Jones*, a bus attendant employed by the District of Columbia School System challenged the system's policy of requiring all of its employees to undergo testing as part of a medical examination. The D.C. Circuit disagreed with the district court's conclusion that bus drivers and mechanics could be required to undergo such testing while bus attendants could not. It found that the school system's mission of safely transporting children to and from school represented a compelling government interest and that the strength of this interest, combined with evidence of a serious drug problem in the work force justified testing in the absence of individualized suspicion. The D.C. Circuit found that the administration of the test and the context of the physical examination minimized the intrusions upon the employees' privacy. It concluded that a drug urinalysis test with the nexus to the employer's legitimate safety concerns would satisfy the second prong of the reasonableness test.

The administration of drug urinalysis testing in the context of bona fide medical examinations has also been recognized in a recent district court decision as a significant factor in rendering the testing reasonable. In *Wrightsell v. City of Chicago*, 678 F.Supp. 727 (N.D.Ill.1988), a group of police officers challenged the City of Chicago Police Department's drug testing policy. They alleged that the City's policy authorized random drug testing, testing upon individualized suspicion, and testing pursuant to bona fide medical examinations after police officers return from more than thirty days of leave. The City filed a motion to dismiss, and the court granted it as to those plaintiffs who challenged the urinalysis testing conducted pursuant to the routine medical examinations. The court reasoned:

Under the facts alleged, the City's interest in public safety, as served by hav-

---

**5.** The plaintiff union also alleges in its complaint that COTPA's testing program violates the employees' rights under the First, Fifth, Ninth and Fourteenth amendments and under various provisions of the Oklahoma Constitution. However, no briefs, or arguments were submitted by the union as to these additional provisions.

It should be noted that since urinalysis reveals physical characteristics rather than "any knowledge the person may have had," COTPA's program did not constitute the compelled self-incrimination protected by the Fifth Amendment. *Von Raab*, 816 F.2d at 181 (quoting

*United States v. Wade*, 388 U.S. 218, 222, 87 S.Ct. 1926, 1929–1930, 18 L.Ed.2d 1149 (1967)). Moreover, in light of the limited dissemination of the information revealed by the testing, the program did not violate the COTPA employees' constitutional right to privacy. *See Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

As to plaintiff's allegations under the Oklahoma Constitution, the plaintiff union has acknowledged in its trial brief that the issues involved are the same as under the Fourth Amendment.

ing a fit police department, sufficiently outbalances the minimal interest in already discharged urine to justify drug screening during routine employment-related medical examination. It is again emphasized that the tested employees are public safety employees; the medical examinations are routine and employment-related; and there is no allegation that the urine samples are obtained in any manner more intrusive than in an ordinary medical examination nor that the testing procedures are unreliable. [citations omitted]

*Id.* at 678 F.Supp. at 734.

In addition, two recent decisions involving public transportation employees support the Court's finding. In *American Federation of Government Employees v. Dole*, 670 F.Supp. 445, 447 (D.D.C.1987), the court rejected a challenge to the United States Department of Transportation's program of random drug urinalysis testing of various classes of employees in positions relating to public health, safety, national security, and law enforcement. The court pointed to the legitimate objectives of the testing, the advance notice given to the employees, the rules and regulations of the program that eliminated the potential for the abuse of discretion by those administering the program, and the probable preventive effect of the program.

Finally, in *Transport Workers' Local 234 v. Southeastern Pennsylvania Transport Authority*, 678 F.Supp. 543 (E.D.Pa. 1988), the court rejected a similar challenge to a program of random drug urinalysis testing by a company operating subway and commuter rail service in the Philadelphia area. The court found that in the case of this agency, reliance on individualized suspicion testing had proved inadequate. It found that the agency was legally and ethically obligated to take steps to reduce the drug abuse problem to a minimum and stated that the agency "should be encouraged to take remedial measures and to design new personnel programs if reasonable and minimally intrusive." *Id.* at 549. In finding that the program did not violate the Fourth Amendment, the court cited the fact that the results of the test were treated with great confidentiality, that the program was designed such that the results would not lead to criminal charges, that detailed chain of custody procedures were applied in handling the samples, that the program had a rehabilitative component and allowed employees the opportunity to volunteer for a drug abuse program without facing disciplinary action, and that the program established standards sufficient to protect employees from the exercise of discretion by management in determining which employees would be tested and in what manner.

The same public safety concerns and the same factors reducing the intrusiveness of the testing conducted that are present in the programs considered in these two recent cases are present in the case at bar. Moreover, since COTPA's program, unlike the programs in these two cases, does not authorize random testing of employees, it is significantly less intrusive. The reasoning of these two cases supports the Court's finding that COTPA's plan is reasonable and does not violate the Fourth Amendment.

### Conclusion

The case at bar requires the Court to balance the public's interest in safe mass-transportation against the privacy interests of governmental employees. In the absence of a determination by the Supreme Court of the Fourth Amendment standards specifically applicable to drug urinalysis testing, the Court has applied general Fourth Amendment principles and has consulted the decisions of various courts that have faced the question of such testing. In this case, balance tips in favor of the public interest. The plaintiff union's request for a declaratory judgment and a permanent injunction is therefore denied.

It is so ORDERED.